## SANDERS v. SOUTHERN ELECTRIC RAILWAY COMPANY, Appellant.

### Division One, December 23, 1898.

1. Negligence: EVIDENCE: ORDINANCE: EFFECT OF. The reading in evidence, without objection, of a city ordinance, requiring electric cars to be stopped as soon as possible after the motorman discovers' a vehicle on the track or moving towards it, establishes the fact that such an ordinance had been adopted by the city, but it did not establish its legal effect and binding force upon the railway company. That was a question of law for the court to determine.

2. ————: ————: ————: COLLISION: CAUSE OF ACTION: NECESSARY PROOF. A petition charging an electric railway with negligence, based on a violation of an ordinance requiring the motorman to "keep a vigilant watch for all vehicles on the track or moving toward it, and on the first appearance of danger to such vehicle, to stop the car in the shortest time and space possible," does not state a cause of action unless it further alleges that the railway company, in consideration of its franchise from the city, undertook and agreed to obey the provisions of said ordinance. The agreement of the railway company to comply with the ordinance created a *contractual* liability on its part, which did not exist at common law, and without which the city was without power to bind it. The petition, therefore, in such case, must allege such agreement. And that defendant made such agreement, must be *proved*, or else the injured person does not make out a *prima facie* case. Such agreement can not be inferred from the fact that the company was operating its cars on the streets of the city.

147 411
f 147 678
f 80a 231

147 411
f 152 265

147 411
f 153 258
153 259
153 261
81a 485

147 411
f 88a 241

147 411
157 246
157 248
157 634
157 637
157 638
85a 63

147 411
161 420

147 411
88a 101

147 411
97a ²379

3. ———: ———: ———: POLICE POWERS. The city does not have the right under its police powers to adopt such an ordinance. Laws controlling the liability of citizens *inter sese*, must emanate from the Legislature, in whom alone such power is vested by the Constitution.

*Appeal from Gasconade Circuit Court.*—HON. RUDOLPH HIRZEL, Judge.

REVERSED AND REMANDED.

LUBKE & MUENCH for appellant.

(1) The ordinance in question is enforcible only when it is shown that the company has contracted to perform it. The degree of care imposed by the ordinance being greater than that of the common law, the city in the absence of contract has no power to enforce it. The ordinance when offered in evidence could not have been ruled out, since the petition alleged a contract with defendant. But when plaintiff rested without having made good this latter allegation, it was error to instruct the jury that defendant was bound to observe the ordinance. Fath v. Railroad, 39 Mo. App. 447; s. c., 105 Mo. 537; Senn v. Railroad, 108 Mo. 152. (2) The city of St. Louis had no power to pass this ordinance. Its powers, specified by the scheme and charter as to the operation of street railways, are: *First.* Authority to "license, tax and regulate" the cars. R. S. 1889, p 2097. *Second.* Authority to "regulate and control" their "fares, hours and frequency of trips, and the repair of their tracks, and the kind of their rails and vehicles." R. S. 1889, p. 2099. *Third.* Authority "to regulate the time and manner of running cars, and the rates of fare . . . and the sale of tickets, and exchange thereof between the several companies." R. S. 1889, p. 2133. The expression of these powers excludes all others on the same subject under the doctrine *expressio unius est exclusio alterius.*" St.

Louis v. Bell Telephone Co., 96 Mo. 623; State ex rel. v. Railroad, 85 Mo. 263; Kansas City v. Corrigan, 86 Mo. 67. (3) The ordinance is illegal, for it is oppressive and unreasonable, and is not in harmony with the general law of the State which requires only ordinary care. Municipalities are not invested with the powers of sovereignty; their ordinances must be fair and reasonable; otherwise the courts will hold them void. Corrigan v. Gage, 68 Mo. 541; Railroad v. Springfield, 85 Mo. 674; Hannibal v. M. & K. Telephone Co., 31 Mo. App. 23. (4) A city ordinance can not change the common-law liabilities of a civil nature between private parties, nor fix a new standard of negligence as a basis for an action on the case. Heeney v. Sprague, 11 R. I. 456; Railroad v. Erwin, 89 Pa. St. 71; Van Dyke v. Cincinnati, 1 Disney, 532; Flynn v. Canton, 40 Md. 612; Kirby v. Boylston, 14 Gray, 242; Jenks v. Williams, 115 Mass. 217.

JOHN W. BENSTEIN and A. R. TAYLOR for respondent.

(1) It was entirely unnecessary to have proven any contract by the appellant to obey the ordinance, for the introduction of the ordinance, which was the evidence relied upon, was the evidence to be put before the jury; and if there was any preliminary proof necessary to its introduction, it was waived by appellant not objecting to the ordinance. Dunkman v. Railroad, 95 Mo. 238. (2) The ordinance was passed by the city of St. Louis as a police regulation for the protection of the lives and limbs of the people and is a valid exercise of the power conferred upon the municipal assembly by the charter of St. Louis, as found at pages 2132, 2133, Revised Statutes 1889. The charter of the city of St. Louis being authorized by the Constitution of the State, article 10, sections 20 to 25, inclusive, stands upon the same plane

as a legislative act of the State, except the limitations contained in the grant of power, to wit, "that such powers shall be in harmony with and subject to the laws of Missouri." This charter empowers the municipal assembly by ordinance to regulate and control street railroads (article 10, sec. 1, pp. 2132, 2133, R. S. 1889), and to regulate the time and manner of running cars. (Art. 10, sec. 2, p. 2133, R. S. 1889.) It is urged that to require the motorman and conductor to keep a vigilant watch, and to stop the car in the shortest time and space is not within the powers thus delegated to the people of St. Louis in their charter, because it requires of the street railroad more care and diligence than is required of other citizens at the common law. But every police regulation for the protection of life and limb does this. If the common law were sufficient for the purpose, no police regulation or law would be required. To require a railroad running through a city to limit its speed and to ring its bell, has without exception in this State been held to be a valid exercise of the police powers to regulate. Karle v. Railroad, 55 Mo. 481; Dahlstrom v. Railroad, 108 Mo. 525; Schlereth v. Railroad, 115 Mo. 87; Klein v. Railroad, 90 Mo. 314; Kelhey v. Railroad, 101 Mo. 67; Murray v. Railroad, 101 Mo. 236; Gratiot v. Railroad, 116 Mo. 463; Prewitt v. Railroad, 134 Mo. 615; City v. Russell, 116 Mo. 255; Bergman v. Railroad, 88 Mo. 682.

MARSHALL, J.—This is an action to recover damages for personal injuries received from a collision between an electric street car and the wagon which the plaintiff was driving. It occurred at the intersection of Seventh and Hickory streets, in the city of St. Louis, on the 21st of August, 1893, between seven and eight o'clock in the morning. Seventh street is 60 feet wide and Hickory street is 50 feet wide. Plaintiff was driving his wagon south on Seventh street, and the car was going east on Hickory street,

that street having a fall of five feet between Eighth and Seventh streets.

The negligence alleged in the petition is: *First,* a failure to give any signal or ring the bell when the car approached the crossing; *second,* that the brakes and brake shoes on the cars were defective and worn out and loose, so that the car could not be stopped soon enough to avoid the collision; and *third,* that section 1,275 of ordinance 17,188 of the city of St. Louis provides that drivers, motormen, gripmen and conductors of street cars shall keep a vigilant watch for all persons on foot and for vehicles, either upon their railway tracks or moving towards them and upon the first appearance of danger to such person or vehicle, the car shall be stopped within the shortest time and space possible; that the motorman and conductor on this car did not keep such a vigilant watch and failed to stop the car in the shortest time and space possible upon first appearance of danger to plaintiff; that in consideration of the grant by the city of St. Louis of its franchise to operate its railway and cars the defendant undertook and agreed to obey the provisions of the ordinance, and at the time of the grant took out a license from the city to operate the cars.

The answer was a general denial and a plea of contributory negligence.

Plaintiff's version of the accident is that when he reached Hickory street, he stopped, looked west on Hickory street and saw the car turning in Hickory street from Eighth street, and "I got time enough and drove my horse on and might get over;" that he was driving at a walk; could see and hear everything, but heard no bell; saw the motorman put the brake on the car as it came into Seventh street, but the life-guard in front of motor car struck the right hind wheel of his wagon, threw plaintiff out and injured him very seriously; that from the time he saw the car at 8th street until his wagon was struck, he traveled fifteen feet. Plain-

tiff's witness, Stout, testified that he was at the front of his house which was 75 feet east of Seventh street and that when plaintiff's horse had reached the north side of Hickory street, the car was 150 to 200 feet west of Seventh street on Hickory street; that the motorman did not attempt to stop the car until it was about 12 or 15 feet from the wagon; and that the motorman was talking to some one standing on the south side of the car. Another witness for plaintiff, Waggoner, testified that the car was about forty feet away when the plaintiff's horse reached the street car track on Hickory street, and that the motorman was speaking to two young men who were sitting with him on the front of the motor car, but on cross-examination he said he could not hear the motorman speak or see his lips move but "saw him have his head over to the men."

James A'Hearn, another witness for plaintiff, testified that he was a passenger on the car, and was sitting on the third seat from the front, on the north side of the car; that he did not see the accident, heard no bell rung and did not notice the car stopping before the accident, but on cross-examination he said he "was sitting there thinking and gave no attention to whether the bell rang or not and gave no attention at all to what was going on until the people in the car jumped up and got off"—that he "may have dozed off and been asleep at the time."

Without objection by defendant the plaintiff read in evidence the fourth subdivision of section 1275, art. 6, Rev. Ord. St. Louis, 1892, as follows: "The conductor, motorneer, gripman, driver in charge of each car shall keep a vigilant watch for all vehicles and persons on foot, especially children, either on the track or moving towards it, and on the first appearance of danger to such person or vehicles, the car shall be stopped in the shortest time and space possible."

The demurrer to the evidence being overruled, the defendant duly excepted.

The defendant's showing was as follows:  Mrs. Hollen-schmidt, a passenger on the car, seated in the third seat from the front, said that as the car neared 7th street, she saw the head of plaintiff's "horse coming from behind the building; that as he got to the crossing, Sanders slowed up his horse and looked out of his closed wagon, and with that he gave his horse the line and started, and that they were so close together at that time that the conductor could not stop the collision, that when Sanders looked out of his wagon, the car was within 12 or 15 feet of Seventh street; that there was not time enough after Sanders looked out and then leaned back and gave the horse the rein for him to get over the track; that the motorman rang the bell all the way from 8th to 7th street.

Louis Ringling testified that he was riding on the front platform of the car; that the motorman rang the bell all the way from 8th street to the alley because there was a wagon in the track ahead of him; that the wagon left the track at the alley; "that when the car was within fifteen feet of Seventh street, Sanders' wagon came to the crossing and stopped, and Sanders then hit the horse with the lines and tried to head off the car; that the motorman shut off the power and applied the brakes to stop the car," but could not prevent the collision; that Hannigan was standing on the platform with him.

John L. Hannigan testified substantially the same as Ringling.

John F. Smith, a passenger on the car, occupying the second seat from the rear, testified to the ringing of the bell all the way from 8th to 7th street.

Charles H. May, a passenger on the car, seated in the fourth seat from the front, testified that the bell was rung; that he, "saw Sanders as he came into Hickory street, and saw him stop his horse and look, and then hit his horse to

go ahead; that the car was then just coming into Seventh street, and when Sanders started ahead the motorman at once shut off the power and turned the brakes; that when Sanders stopped the motorman started ahead with the car, and as soon as Sanders started again the motorman shut off the power and applied the brakes."

Peter Guyot, a passenger, seated on the second seat from the rear of the car, testified to the wagon being ahead of the car from 8th street to the alley and to the ringing of the gong.

Elmer W. Selby, the conductor of the train, testified to the wagon being ahead of the car from 8th street to the alley; to the ringing of the gong; that the car came slowly towards 7th street, "and then Sanders came down on the track on Seventh street, stopped and looked out, and then whipped up his horse and tried to cross over; that the car was about four or five feet west of Seventh street when Sanders stopped; the motorman then turned on the power to go forward, and so soon as Sanders hit his horse to go ahead the motorman turned off the power and put on the brakes."

Anthony H. Kaths and George Hinzpeter, motormen who had run the car the day before, testified that the brakes were in good order the day before and up to the time the car stopped that night. They also said that when an electric car is running at the rate of ten miles an hour and loaded with passengers, it can not be stopped, on such a grade as there was on Hickory street, in less than thirty-five feet, and if it is running at the rate of three miles an hour it can not be stopped in less than twenty-five feet.

Lambert S. Walther, a stenographer who had reported a former trial of the case, testified that on that trial Sanders said three times that when he came to Hickory street, "he stopped five or six minutes; that the car was at Eighth street when he came to Hickory street."

At the request of the plaintiff the court instructed the jury as follows:

"1.   If the jury find from the evidence in this case that Seventh street and Hickory street at their intersection and places mentioned in the evidence were on the 21st day of August, 1893, open public streets within the city of St. Louis; and if the jury further find from the evidence that at said time the defendant was using the rail, railway and cars mentioned in the evidence for the purpose of transporting persons for hire from one point to another within the city of St. Louis as a street railway propelled by electricity; and if the jury further find from the evidence that on said day the plaintiff was driving his wagon and team southward on Seventh street at its intersection with Hickory street in the city of St. Louis; and if the jury further find from the evidence that as the plaintiff was so driving his horse attached to his wagon southward on Seventh street across Hickory street, defendant's car collided with the rear wheel whereby plaintiff's wagon was injured and plaintiff was injured on his person and his property and his wagon was damaged; and if the jury further find from the evidence in this case that the defendant's motorman in charge of its motor car either saw the plaintiff driving his horse and wagon towards and upon defendant's track, or by keeping a vigilant watch for vehicles, would have so seen said horse and wagon moving towards and upon defendant's track and in danger of being injured by defendant's said car, and that after so seeing said horse and wagon moving towards defendant's track and in danger of injury from said car, defendant's motorman and conductor in charge of its car could, by stopping said car within the shortest time and space possible under the circumstances, have averted said collision and injury and neglected so to do; and if the jury further find from the evidence that the plaintiff, before starting across Hickory street, looked and listened for an

approaching car upon defendant's said track and saw said car a sufficient distance away from said crossing to have enabled him to cross said track in safety if defendant's servants had so kept said vigilant watch, and so managed said car; and if the jury further find from the evidence that the plaintiff exercised ordinary care in driving towards and upon defendant's track to avoid injury; then the plaintiff is entitled to recover, and the jury should find their verdict for the plaintiff.

"2. The court instructs the jury that by the terms of the ordinance read in evidence the defendant's motorman and conductor in charge of the car that collided with the plaintiff's wagon were bound to keep a vigilant watch for persons on foot and vehicles either upon defendant's track or moving towards it, and upon the first appearance of danger to such person or vehicle said motorman and conductor were bound to stop said car within the shortest time and space possible, and a failure to so keep such vigilant watch and to so stop said car (if defendant's said servants did so fail) was negligence upon the part of the defendant. And if you find that such negligence caused said collision and injury to the plaintiff's person and property; and if the plaintiff was exercising ordinary care at the time of and before said injury in looking and listening for an approaching car and in averting injury from a collision with said car, then plaintiff is entitled to recover.

"3. The court instructs the jury that the plaintiff had the lawful right to drive his horse and wagon along Seventh street across defendant's track. And if the plaintiff was driving to and upon said track a sufficient distance ahead of the defendant's car to have enabled defendant's servants in charge of the car to have seen said team and wagon by keeping a vigilant watch and to have stopped or checked said car, and averted said injury, and if the plaintiff was exercising ordinary care in looking and listening for a car on defend-

ant's track and in avoiding injury therefrom, then the plaintiff is entitled to recover.

"4.   By the term 'ordinary care' as used in the instructions is meant that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.   A failure to exercise ordinary care as so defined is negligence.

"5.   The court instructs the jury that the burden of proving that the plaintiff did not exercise ordinary care to avoid the collision and injury is upon the defendant.

"6.   The jury are the sole judges of the weight of the evidence and the credibility of the witnesses, and in determining the same you may consider the interest any witness may have in the case, his manner upon the stand and the probability or improbability of his testimony in connection with all the facts and circumstances proven in the case.   If you believe that any witness has willfully sworn falsely to any material fact in the case, you may disregard any part or all of such witness's testimony.   By the preponderance of the evidence is meant the greater weight of the evidence as you may determine the same, not simply from the number of witnesses testifying, but from the character of the testimony itself, and the credibility of the witnesses as determined by you in the light of all the facts and circumstances proven in the case.

"7.   If the jury find for the plaintiff, they should assess his damages at such a sum as they may find from the evidence will be a fair compensation to him; *first,* for any pain of body or mind, including physical inconvenience; *second,* for any loss of the earnings of his labor; *third,* for any expense necessarily incurred for medical attention; which the plaintiff has sustained or will hereafter sustain by reason of his injuries, not exceeding five thousand dollars."

The court of its own motion gave the following instructions:

"No. 3.    The court instructs the jury that the plaintiff had the lawful right to drive his horse and wagon along Seventh street across defendant's track.    And if the plaintiff was driving to and upon said track a sufficient distance ahead of the defendant's car to have enabled defendant's servants in charge of its car to have seen said team and wagon by keeping a vigilant watch, and to have stopped or checked said car, and averted said injury, and if the plaintiff was exercising ordinary care in looking and listening for a car on defendant's track, and in avoiding injury therefrom, then the plaintiff is entitled to recover.

"No. 4.    By the term 'ordinary care' as used in the instructions is meant that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.    A failure to exercise ordinary care as so defined is negligence.

"No. 7.    If the jury find for the plaintiff, they should assess his damages at such a sum as they may find from the evidence will be a fair compensation to him: *First,* for any pain of body or mind, including inconvenience; *second,* for the loss of any earnings of his labor; *third,* for any expenses necessarily incurred for medical attention, which the plaintiff has sustained or will hereafter sustain by reason of his injuries, not exceeding five thousand dollars."

At the request of the defendant the court instructed the jury as follows:

"2.    The court instructs the jury that it was the duty of plaintiff Sanders to exercise ordinary care upon his part and to make use of his faculties on approaching the crossing of defendant's track; that whether the servants operating defendant's car by electricity gave signals or not, it was the duty of Sanders to look and listen before driving on the track; and if from the evidence the jury believe that Sanders failed to exercise ordinary care and failed to look and listen and thereby contributed to his wagon and defendant's car

coming into contract and causing the injuries here sued for, then the verdict should be for defendant company.

"5.   If from the evidence the jury believe that both the plaintiff and the servant of defendant operating defendant's car were both equally guilty of negligence which directly contributed to the injury, then the verdict should be for defendant.

"6.   If from the evidence the jury believe that the injuries complained of by the plaintiff resulted from an accident, the true cause of which the jury can not determine from the evidence, then the verdict should be for the defendant.

"8.   There is no evidence to show that the brakes and brake-shoes on defendant's car were in a defective or worn-out condition, or that they were loose or would not hold the wheels of the car so that the car could be stopped within a reasonable time and distance."

The defendant asked and the court refused to instruct the jury as follows:

"3.   The court also instructs the jury that it was the duty of plaintiff before crossing defendant's track to look and listen for approaching cars of defendant, operated by electricity, and if from the evidence the jury believe plaintiff failed to stop and look and listen as above required and thereby directly contributed to his being injured, then the verdict should be for defendant company.

"4.   If from the evidence the jury believe that defendant's servants operating its cars saw plaintiff driving towards defendant's track, they had a right to presume that he would not attempt to cross immediately in front of the train, and if you further believe from the evidence that plaintiff on approaching the track saw the car coming and halted his wagon and that defendant's motorneer saw this, then the motorneer had the right to presume that Sanders intended to remain halted until the cars had passed him,

and if you further believe from the evidence that Sanders started up again and drove onto the track and that the motorneer stopped the cars within the shortest time and space practicable after Sanders started up again, then your verdict should be for defendant company.

"7. The charge of negligence made by plaintiff against defendant by this action must be proved to the satisfaction of the jury by plaintiff by a preponderance of the evidence. The jury have no right to presume negligence; and if the evidence does not preponderate in favor of plaintiff, then the verdict should be for defendant."

There was a verdict for plaintiff for three thousand dollars, and after proper preparatory proceedings, defendant appealed.

## I.

The first and second grounds of negligence pleaded— the failure to ring the bell and the defective condition of the brakes—need not be considered. The first was abandoned on the trial by the plaintiff. It was wholly unsupported by any evidence, except that of James A'Hearn, who said that he did not hear any bell and he admitted that he might have been asleep, and that of the plaintiff, who said he did not hear any bell, but on the contrary it was shown by seven witnesses for defendant that it was rung from Eighth street eastwardly. This brings it, therefore, within the rule laid down in Shaw v. R. R. Co., 104 Mo. 656-7 and Seibert v. Erie R. R. Co., 49 Barb. l. c. 586. Moreover, no instructions were asked by the plaintiff bearing on this alleged negligence. There was a complete failure to introduce any evidence in support of the second allegation of negligence, and the court properly withdrew that from the consideration of the jury by the 8th instruction given for the defendant.

The whole case for the plaintiff was put to the jury upon the third allegation of negligence.

The ordinance regulation of the city of St. Louis (which was the sole foundation for this charge of negligence) was introduced in evidence without any objection by defendant and it is now insisted that the defendant can not be heard to raise any question concerning it, and furthermore that the city had a right, under its police powers, to adopt it, and that it is binding upon the defendant.

The reading of the. ordinance in evidence established the *fact* that such an ordinance regulation had been adopted by the city, but it did not and manifestly could not determine its legal effect or binding force upon defendant. That was a question of *law* for the court to determine. It left the case in precisely the same position as if the plaintiff in his petition had pleaded the ordinance and its violation as the only negligence of the defendant, and the defendant had demurred to the petition. In this way the fact that there was such an ordinance regulation would have been admitted by the defendant, but its legal effect upon it and its liability for violating it would present a simple question of law for the court to decide. The plaintiff evidently knew such a petition would be adjudged insufficient in law, for he followed up his allegation as to the existence of such an ordinance, by averring "that the defendant in consideration of the grant of the city of St. Louis of its franchise to operate its railway and cars as aforesaid, undertook and agreed to obey the provisions of said ordinance aforesaid. And the defendant at said time had taken out a license from the city of St. Louis to operate said cars." This allegation was necessary to the statement of a cause of action predicated upon the ordinance. It required the ordinance and the contract both to constitute a cause of action. This precise ordinance regulation underwent adjudication by this court in Fath v. Tower Grove & Lafayette Ry. Co., 105 Mo. 537, and SHERWOOD, J., said: "Proceeding, then, to inquire into the validity of the ordinance, it may be admitted, at the outset, that

it is beyond the power of a municipal corporation by its leg-
iglative action directly to create a 'civil duty, enforcible
at common law;' for this is an exercise of power of sov-
ereignty belonging to the *State*. This position is fully sus-
tained by the authorities cited on behalf of defendant."
The agreement of the defendant to comply with the ordi-
nance provision in question, was held to create a *contractual*
liability on the part of the defendant which did not exist at
common law and without which the city was without power
to bind the defendant. The conclusion reached in that case
was approved in Senn v. The Southern Ry. Co., 108 Mo. l. c.
152.

The petition therefore stated a cause of action, but the
proof failed to make out a *prima facie* case, because, though
the ordinance was allowed to go in evidence without objec-
tion, that alone would not make out a case of legal liability;
it required proof of the allegation that the defendant agreed
to be bound by it. No such proof was attempted to be
offered by the plaintiff. The mere fact that the defendant
was operating street cars upon the streets of the city, does
not establish the allegation that it does so under a grant or
license of the city, *non constat,* it may have acquired the
right from the State, prior to the adoption of the Constitu-
tion of 1875, nor that the city in consideration of the grant
required the defendant to so agree, nor that the defendant
has so agreed.

The contention that the city has the right under its
police powers to adopt the ordinance is not tenable. A city
to which a portion of the police powers of the State have
been delegated, has a right to enact police regulations and
to punish their violation by fine and imprisonment, but it
can not under the guise of the exercise of its police powers
create a liability from one citizen to another, or create "a
civil duty, enforcible at common law," for this is " the ex-
ercise of the power of sovereignty belonging alone to the

State." The legislature may delegate a part of the police power of the State to a municipality, but it can not delegate the legislative functions of making laws that will be binding upon citizens between themselves in civil proceedings. The police regulations control the citizen in respect to his relations to the city, representing the public at large, and for this reason are enforcible by fine and imprisonment, but laws controlling the liability of the citizens *inter sese,* must emanate from the legislature, in whom alone such power is vested by the Constitution. [Norton v. St. Louis, 97 Mo. 537; St. Louis v. Connecticut Life Ins. Co., 107 Mo. 92; Heeney v. Sprague, 11 R. I. 456; Railroad v. Ervin, 89 Pa. St. 71; Vandyke v. Cincinnati, 1 Disney 532; Flynn v. Canton Co. of Baltimore, 40 Md. 312; Jenks v. Williams, 115 Mass. 217; Kirby v. Boylston Market Ass'n, 14 Gray, 249.]

A provision of the charter of a city, whether the charter be granted by an act of the legislature, or be adopted by the people of the city pursuant to the power conferred by Art. 9 of the Constitution which takes the place and has the force and effect of a legislative Act, stands on a totally different plane from an ordinance of a city passed under its police power. The latter creates no new right or remedy between citizens; is enforcible only by *quasi* civil-criminal proceedings, and creates a municipal misdemeanor. The former is as much a law of the State as if it had been enacted by the legislature. The legislature under its reserve powers in the Constitution may repeal or amend it, but until it does so, the provision of the organic law is a valid regulation and is binding upon citizens both in their relation to the city and among themselves. The reason is that the people—the source of all power—conferred the right, by the Constitution, upon the city to so legislate by its organic law, just as they granted the legislative power generally to the General Assembly, or the judicial power to the courts. When these

principles are understood there can be no difficulty in solving any question that may arise on this subject.

It is plain, therefore, that the circuit court erred in overruling the demurrer to the evidence and also in giving the 1st and 2nd instructions asked by the plaintiff and the 3d instruction of its own motion.

As the case must be tried over it is proper to say that the 4th instruction asked by defendant should have been given. It announces a correct proposition of law and there was abundant evidence upon which to base it. The 7th instruction asked by defendant should also have been given. It must have been an oversight on the part of the court to refuse it. The proposition of law it asserts is too plainly right to admit of discussion—it is axiomatic, and the only exception to the rule therein announced is in the exceedingly rare instances where the doctrine of res ipsa loquitur applies.

The judgment of the circuit court is reversed and the cause remanded. All concur.