ALLAN DAY, by his next friend, Respondent, v. CITIZENS RAILWAY COMPANY, Appellant.

**St. Louis Court of Appeals, November 14, 1899.**

**Negligence: EVIDENCE: ORDINANCE: INSTRUCTIONS.** Action based on negligence—grounds two; first, negligence of defendant's employees in managing its cars; second, in their failing to observe a city ordinance and keep a vigilant watch for persons on foot, either on the track or approaching it.

Judgment for plaintiff reversed and remanded for errors following:

    (1)  First instruction for plaintiff was grounded on the ordinance set out in his petition, when there was no evidence that appellant had agreed to it, which was necessary to make the ordinance binding, hence instruction was erroneous.

    (2)  Plaintiff's second instruction was erroneous because inapplicable and predicated on facts *dehors* the record.

    (3)  The third instruction assumed that plaintiff was of "tender years and imperfect discretion," an assumption unwarranted by the evidence. Whether plaintiff was of "tender years

and imperfect discretion" should have been submitted to the jury, and the facts of his age, capacity, experience and knowledge of the particular danger passed on by it, and not by the court.

(4)   The fourth instruction, says this court, "is not supported by a ray of evidence adduced at the trial."

Appeal from St. Louis City Circuit Court.—*Hon. William Zachritz*, Judge.

REVERSED AND REMANDED.

*Smith P. Galt* for appellant.

(1)   The court erred in giving the plaintiff's instruction number 1, because, first, it had not been shown that the defendant was amenable to the ordinance, upon which the instruction was founded; and, secondly, there was no evidence that the car could have been stopped in time to save him, even if the motorman had seen plaintiff as he left the pavement; thirdly, to have seen him as he left the pavement, the motorman could not have been keeping a vigilant watch ahead where danger is to be expected, but would have to have been looking back, as the boy came from the rear of the front of the car; fourthly, this instruction entirely ignores the plaintiff's own negligence.   There was no evidence that defendant had ever agreed to be bound by the ordinance set forth in plaintiff's petition.   Byington v. Railroad, 49 S. W. Rep. 876.   (2) The court erred in giving plaintiff's instruction number 2 for the following reasons:   First.   It illustrates the vice of declaring general principles of law, and when the court desires to educate the jury in general principles of law, if those general principles are not strictly applicable to the case on trial, wrong is sure to come to one of the parties.   The instruction recites, "considering the number of persons and

vehicles on said street," when the accident occurred on Sunday night in November, and the evidence shows there was not one vehicle on the street, and the only pedestrian on the street was the plaintiff dashing across from the pavement; and the instruction further declares that the motorman "is bound to anticipate the presence of other vehicles and pedestrians on such street," and therefore he must "regulate the speed at which he is moving," so that the car can be "readily and quickly stopped, should occasion require," all of which had the practical effect of telling the jury that on this occasion, if the motorman had not regulated his speed so that the car could be "readily and quickly stopped," then the defendant was liable, notwithstanding the plaintiff ran from the pavement and from behind the front of the car and fell immediately and almost on the fender. If this is the law, and this court will so declare it, it means the immediate destruction of rapid transit in the city of St. Louis, because every car must be so run that it can be "readily and quickly stopped should occasion require," in case at any time and anywhere along the street, a boy or man may, perchance, rush from the pavement to beat the car. Such is not the law. See Van Natta v. R'y, etc., Co., 133 Mo. 13, at p. 22; a case of a passenger. (3) The court erred in giving plaintiff's third instruction. It is not the law that plaintiff should exercise "only such care and prudence as might be reasonably expected of a boy of his age and capacity under similar circumstances. It eliminates entirely the question of plaintiff's knowledge and experience. Ridenhour v. Railroad, 102 Mo. 287; Payne v. Railroad, 129 Mo. 405; Spillane v. Railroad, 135 Mo. 414. (4) The court erred in giving plaintiff's instruction number 5, because, first, it changed the cause of action from one based on the ordinance, to negligence under the common law; and, it was erroneous when taken in connection with instruction number 6, defining "reasonable care," to be the "use of such watchfulness and precaution as were fairly proportioned

to the danger to be avoided," and also in connection with instruction number 2, discussed *supra*, which made the motorman "anticipate the presence of the plaintiff in the street," and "regulate the speed" of the car so that it could be "readily and quickly stopped," in case of danger and as "the danger to be avoided" in this case, was that of a boy running from the pavement from in rear of the front of the car, and diagonally forward past the motorman. This instruction required the motorman to look behind him, to avoid the danger to the boy, who was coming from the side of the car and from behind the motorman

*Alfred A. Paxson* for respondent.

(1) Instruction number 1 is copied and approved in almost identically a similar case. Burnstein v. Railway, 56 Mo. App. 50. (2) Instruction number 2 is approved by our supreme court in the case of Humbird v. Railway, 110 Mo. 80. "It is well settled that an instruction for plaintiff in an action for negligence is not erroneous which authorizes a recovery on facts hypothesized therein without reference to plaintiff's contributory negligence where the latter is submitted to the jury, in a separate instruction." Sackewitz v. Mfg. Co., 78 Mo. App. 156. (3) Appellant's criticism of this instruction is fully answered by our supreme court in the case of Ostertag v. Railroad, 64 Mo. 424. Burger v. Railway, 112 Mo. 238; Jennings v. Schwab, 64 Mo. App. 13; Blackwell v. Hill, 76 Mo. App. loc. cit. 53. (4) The criticism of plaintiff's fourth instruction is answered by the printed abstract filed herein by the appellant itself. Plaintiff's instruction number 5, is modeled after one given in the Burnstein case (56 Mo. App. 50), and as Mr. Galt failed in that case to convince this court that it was erroneous and as his attack here is so novel without the citation of a single authority, I might leave this point without further comment.

BLAND, J.—The charging part of the petition is as follows: "Plaintiff further alleges that on the 6th day of November, A. D., 1898, about the hour of six (6) o'clock p. m., whilst he was crossing Franklin avenue at Thirteenth street, going from the south of said street to the north thereof, and whilst between the tracks upon which defendant runs its cars, he slipped and fell, and before he could recover himself, the defendant, by its agents, servants and employees, who were then and there in charge of and running one of defendant's cars west on said Franklin avenue, so carelessly and negligently managed and conducted the same as to strike and run over plaintiff, cutting off his left arm and wounding him severely on the top of his head and otherwise severely cutting, bruising and injuring him.

"Plaintiff further alleges that his said injuries were the direct result of the negligence, unskillfulness and carelessness of the agents, servants and employees of defendant in charge of said car whilst running, conducting and managing said car.

"Plaintiff further alleges that by Chapter XXXII, Article VI, section 1275 of the Revised Ordinances of the City of St. Louis, Mo., which was in force at the time mentioned herein, and by the provisions of which defendant agreed to be governed in order to obtain its right to use the streets of said city, it is provided and enacted as follows:

" 'Section 1275—Street Cars—Regulation for Running. —The following rules and regulations concerning the running of street railway cars shall be binding upon every person, corporation, company or copartnership taking out license under this article.'

"Fourth. 'The conductors, motormen, gripmen, driver, or any other person in charge of each car, shall, keep vigilant watch for all vehicles and persons on foot, especially children, either on the track or approaching toward the track, and on the first appearance of danger to such persons or vehicles, the car shall be stopped in the shortest time and space possible.'

"Plaintiff further alleges that defendant's motorman, conductor and driver in charge of said car negligently failed to observe the requirements of such ordinance, in that they, nor any one of them, did not keep a vigilant watch for all persons on foot, especially children, either on the track or moving towards the track, and did not, on the first appearance of danger to the plaintiff, stop the car in the shortest time and space possible, but on the contrary, ran the said car at a high degree and unlawful rate of speed, without attempting to slacken same at the time and just before striking plaintiff.

"Plaintiff further alleges that the defendant's said servant did not ring any bell or sound any alarm whilst approaching said crossing just before striking and injuring plaintiff.

"Plaintiff further alleges that by reason of the negligence of defendant's said servants, agents and employees, he has been greatly maimed, injured and mutilated, and has suffered great pain of body and mind, and has been permanently disabled and disfigured for life, all to his damage, in the sum of twenty thousand ($20,000) dollars.

"Wherefore plaintiff prays judgment for the sum of twenty thousand ($20,000) dollars and cost of suit."

The answer was as follows:

"Now comes the defendant in the above entitled cause, and for answer to plaintiff's petition therein, admits its corporation and business as therein stated, and denies each and every other allegation in plaintiff's petition contained.

"And for further answer defendant says that if the plaintiff received any injuries at the time stated in his petition, they were the direct result of his own negligence and recklessness in running upon the railway track immediately in front of a car which he could have both seen and heard approaching, and defendant prays to be hence dismissed with its costs."

About 6 o'clock p. m. on Sunday the sixth of November, 1898, the plaintiff was playing with a little boy on the side-

walk at or near the southeast corner of Franklin avenue and Thirteenth street in the city of St. Louis. A colored boy on the opposite side of the street at or near the northwest corner of Franklin avenue and Thirteenth street, called to plaintiff and he started to run diagonally across the street to the colored boy; when he got on the railroad track he slipped and fell between the rails, and the life guard of a car running west caught him, threw him to the left of the rail, but not clear of it, and the wheels of the car passed over his left arm, cutting it off. He received also a scalp wound. The plaintiff testified substantially as follows: "Frank Pringle and I went across to the south side of Franklin avenue; we got a mouth harp, and I stopped there looking in the show window, and Frank went across Franklin avenue, and he hallooed and told me to come on, and I started, but just as I got out in the middle of the car track I slipped and fell; I went across diagonally; when I slipped and fell I started to get up, and the car hit me and knocked me down, and the wheels of the car run over me; car was coming full speed, if I remember right; I heard no bell ring; they took me over to the drug store, and from there to the doctor's; and from there he took me in the ambulance to the city hospital. The first time I noticed the car was after I fell; I seen it coming; and I tried to get up as quick as I could, but I could not, it was too close; that was the first that I saw and looked for a car, when I fell and realized that there might be a car near to me; I didn't look for any before that; the moment I fell I started to get up, and looked and the car was right onto me; I tried to get up the moment I fell; when I was on the pavement it was standing down at High street, letting some people off there, and after that I didn't pay any attention to it at all; I didn't notice it when I started across; they never rung a bell; it might have rung, too, but I didn't hear it ring, fender struck me and threw me to one side, south, and all the wheels of the south side of the car ran over me; I was on the south side of the car when the car stopped; I

was terribly frightened: I said up at the doctor's office that 'I undertook to run across in front of the car, and slipped and fell and it struck me.'"

Plaintiff further testified that he was on Franklin avenue before the accident and lived only a block away, and that electric cars had been running on that street about seven years, and that he knew that they "ran pretty fast." His mother testified that he was fifteen years old the first day of March preceding the accident; that he was physically strong and had a good mind.

Frank Pringle, the boy who called plaintiff across the street testified in substance as follows: "I am twelve years old. Between five and six o'clock on the evening of the accident I was playing marbles with the plaintiff at 13th and Wash; then we went from there to a cigar store on the south side of Franklin avenue between High and 13th street; I bought a French harp there and I played it awhile; then I started home. I went across the street and he staid on the south side. He was playing there with a boy, and when I got on the north side of the barber shop I called plaintiff and he answered, and I told him I was going home, and he said, 'all right;' then he started on over, cat-a-cornered, towards North 13th street, and when he got between the car tracks he stumbled and fell, then the car hit him and threw him upon the fender, and he fell off on the south side of the car, and the car went about twenty-five feet ahead of him and stopped. The car was going at full speed. I heard no signal or bell. I didn't go to him. I went home and told his mother. When he was going across Franklin avenue he was going cat-a-cornered towards the west. When this accident occurred it was dark, and it was cold and moist. After I came back from the south side of Franklin avenue I stopped on the north side two or three minutes, when I hallooed to him to come on, that I was going home; he came running across. I didn't halloo to him look out for the car. I never seen the car. I

never seen the car till he fell, and then the car was within five or six feet of him, and I knew that he would be hurt because the car was too close to him to stop. I was frightened at his danger. I never noticed the motorman, and do not know what he did. All that I know is that when plaintiff fell, the car was right on him. I had not been paying any attention to the car, before that at all, and I can't tell whether the bell was rung or not, and I can't tell anything the motorman did at all, or how quick he did it to stop the car. The plaintiff was running pretty fast, and as he came running he slipped and fell right onto the track, and the fender struck him. I didn't have time to halloo."

The testimony of other bystanders corroborated the foregoing testimony of plaintiff and Pringle, and further tended to show that the car passed from twenty to twenty-five feet beyond where plaintiff was run over before it stopped, and tended to prove that the motorman made no effort to stop the car, until plaintiff had fallen on the track; also that the bell was not rung. The ordinance mentioned in the petition was read in evidence. For defendant it was shown that High street, where plaintiff testified he saw the car stop to let off passengers, was 146 feet from South 13th street. John W. Rule for defendant testified in substance as follows: "I was the conductor of this car; I was on the rear platform; the first I knew of the accident was the sudden stopping of the car; before I felt anything like the car stopping, the car was running at about from six and one-half to seven miles an hour; when I felt the sudden stopping I looked out on the right hand side of the car to see what the trouble was, and I saw nothing; then I looked to the left hand side of the car, and the boy passed the end of the platform, and he circled a little bit and fell about fifteen feet behind the car; I stepped off and then came to the boy, and I and two other men started with him to a doctor, and the car went on by to the 14th street crossing; at the doctor's I asked the plaintiff, 'How did

you come to get hurt?' and he said 'I meant to run across the track, and slipped and fell, and the car struck me before I could get up;' I said, 'My, you ought not to have done that. Nobody on earth hates it any more than I do, and we would never have hurt you if we could have helped it.' "

Curtis H. Mayhan testified as follows: "I was the motorman on the car that had the accident with this boy. Just before the accident, when I first saw the boy, the car was running at about seven miles an hour. I was standing on the front platform, with one hand on the controller and the other on the brake lever. I was looking forward at the track, keeping a sharp lookout and having the whole street in my view, as far as I could. The first thing I seen of the boy was he came from the south side in a diagonal direction across the street on a very fast run. (The witness illustrated how the boy came running across the street, and the position the car was in.) As he came on the side of the car so I could see him, he was coming on a fast run. As soon as I caught sight of the boy, I threw off the power and reversed my car. In the direction he was going I seen it was impossible for him to make it across the track. I hallooed to him and checked my speed to save him, if I could, from being run over. He came around in front of the car, between five and seven feet, leaning forward and running very fast; fell right in the center of the track. When he fell my car had not stopped. The left-hand corner of the fender caught him, and he fell on the south corner of it, and it pushed him entirely off to one side of the track. The car then went on, and, in passing him, I felt a jar, and I knew the car had passed over some part of him. The car stopped and I stepped over to the left side of the platform and looked down the side of the car, eastward, and at the time the boy was a little east of the front truck. The car was then standing still. The boy was then in the act of getting up, and he got up and ran down along the side of the car to the rear end as if he was going to turn around

the rear end of the car and run around it, and that is the last
I saw of him until I saw the conductor and a couple of other
gentlemen with him on the other side of the street.    When
I first saw the boy he was running from the pavement in a
diagonal direction from the rear of the front part of the car.
The conductor went with him and the two other gentlemen
and boys, and then the conductor came back and told me
to pull over 14th street, and remain there until he came
back, which I did.    Before the accident we made a stop at
High street, below the place of accident, and, on leaving there
and proceeding to the center of the block, I rang the bell just
as I always do.    That was before the accident occurred, a
moment or two before I saw the boy.    The only means of
stopping an electric car are the brakes and the reverse lever.
When I saw the boy coming, as I have described, I knew there
was no way that he could check himself to keep the car from
hitting him.    I thought he was so close that he could not
escape, and I done all that was in my power to keep from hit-
ting him, and all that any other motorman could have done.
I reversed my car as quick as I caught sight of the boy
coming, and when I found my car was going to stop I put on
my brake.    I put on my brake after I reversed because it is
up grade there a bit, and if I ran over him, then my car with
the brake on would not run back and run over him again, so
that when the car stopped, it would be stopped dead still.    To
do all that, I first had to throw the power off, then I reversed
my lever, then put the power on again.    That is the only
way in which a reverse can be made to act.    The idea of that
is to stop the wheels and make them revolve the other way.
While you are doing that the car will run some distance.    By
the time the car had come almost to a stop the wheels had
run over him and the idea of putting on the brake was to keep
the car from running backwards over him.    I could not
possibly, with all the appliances I had, have stopped that car

any quicker than I did after the boy came in sight.  There was no person on the front platform with me.  I thought there was one passenger on the front seat on the right-hand side of the car.  I don't think there was any on the front seat on the left-hand side.  There were several vacant seats in the car.  When I left High street I was looking forwards the full width of the street.  I could see all the vehicles and persons there the full width of the street.  I didn't see the boy when he first left the sidewalk.  He was somewhere midway between the curb-stone and the sidewalk; I can not say exactly.  I didn't see him leave the sidewalk, simply because he was almost behind the car, at the side of it.  I don't remember of any vehicles being on the street there at the time.  I hallooed at the boy when I first saw him.  There is a sort of grade westward at that point.  The reason I didn't see the boy sooner than I did, though I was looking forwards, simply was his coming in the way he was diagonally.  The track was damp and slippery.  The distance in which I can stop an electric car, under the conditions existing there, is from twenty-five to seventy-five feet.  I will say from fifteen to seventy-five feet.  I suppose the car went about twenty feet after I reversed it.  Sometimes the reverse takes effect right away, and others it does not; it depends on circumstances; no one can explain that.  On this occasion the reverse action was almost immediate.  While in the act of reversing, throwing off the power and then reversing it, and then throwing the power on, the car will go from eighteen to twenty feet, or its length.  I say the car went from eighteen to twenty feet during the time I was throwing off the power and reversing. I rang the bell in the middle of the block.  I gave it two rings."

Robert McCulloch, general manager of defendant, testified that "Appliances on a car to stop it, are the brake, the ordinary appliances, and the reverse motion.  When reversing, first the power has to be thrown off, then the reverse

lever is pulled back, then the power is thrown on again; it tends to revolve the wheels in the other direction. The motorman has to make three lever motions before reverse is effected, then it begins its application to the wheels. He must not use his brake while doing that, because if he locks the wheels with the brake, it counteracts the effort made to revolve them in the other direction. Note the conditions which have been stated in this case. It would be a remarkably good stop if the motorman stopped in thirty feet. Everything would have to act very promptly indeed in order to do it. A car going at seven miles an hour goes about twelve or thirteen feet a second."

At the close of plaintiff's evidence, and at the close of all the evidence defendant offered an instruction that plaintiff could not recover, both of which were refused. The court at the instance of plaintiff gave to the jury the following instructions, which appellant contends were erroneous, to-wit:

1. "The court instructs the jury that it was the duty of the motorman of defendant's car to keep a vigilant watch for persons on foot, especially children, either on the track or moving towards it, and on the first appearance of danger to such persons to stop the car in the shortest time and space possible; and if the jury believe, and find from the evidence, that the plaintiff, Allan Day, was either on the track or moving towards it, and that the motorman of defendant's car would have seen him in time to have stopped the car and prevented the injury to said Allan, if he kept a vigilant watch, their verdict should be for the plaintiff."

2. "Any motorman in charge of a car propelled by means of electricity upon a public street, is bound to anticipate the presence of other vehicles and pedestrians in such street. The law requires that a person so in charge of an electric car should be watchful to see that the way is clear in the direction he is moving, and that he should regulate the speed at which he is moving, and, if, under all the evidence

in this case, you find that the motorman of said car was moving the same at a rate of speed at which it could not be readily and quickly stopped, should occasion require, that such rate of speed was careless and dangerous, considering the number of persons and vehicles on said street, and if you find that the injury to plaintiff was caused by such negligence, your verdict must be for the plaintiff."

3. "The jury are instructed that the plaintiff was bound to exercise only such care and prudence as might reasonably be expected of a boy of his age and capacity under similar circumstances, and that the same degree of care and prudence in avoiding danger is not required from a person of tender years and imperfect discretion as from a person of mature years and great discretion under similar circumstances, and if the jury believe from the evidence that plaintiff was at the time of the accident of about the age of fifteen years, they may take that fact into consideration in considering the question of negligence or carelessness on the part of plaintiff."

4. "The court instructs the jury that, notwithstanding you may believe from the evidence that Allan Day was playing at, near, or on the track, yet if you further believe that the motorman of defendant's car, by the exercise of reasonable care, could have seen him, and the car could have been stopped by the motorman by the exercise of ordinary diligence and skill, with safety to himself, the car, and those on the car, in time to have averted the injury to said Allan Day, your verdict should be for the plaintiff."

5. "The court instructs the jury that, even though you should find from the evidence that the plaintiff, Allen Day, was guilty of carelessness or negligence, which contributed directly to his receiving the injuries, yet, if you further find and believe from the evidence that, before the accident and after the motorman of the car discovered, or might by the exercise of reasonable care on his part, have discovered the danger in which plaintiff was, he, the said motorman, could, by the

exercise of reasonable care and skill, with safety to himself, the car and those on the car, have averted the injuries complained of, your verdict should be for the plaintiff."

The court gave five instructions for defendant, and refused the following: "The court instructs the jury that there is no evidence tending to prove that the defendant is amenable to the provisions of the ordinance read in evidence, and therefore the court withdraws the same from the consideration of the jury."

"The court instructs the jury that there is no evidence tending to prove that the car was running at an unlawful or negligent rate of speed, at or before the accident, and therefore the jury are instructed that that question as to an unlawful or negligent rate of speed is withdrawn from their consideration."

Instruction number 1 given for plaintiff is hypothecated on the city ordinance set forth in the petition and read in evidence. There was no evidence that defendant had agreed to this ordinance. Respondent's contention that the answer admits that appellant had agreed to the ordinance, is not borne out by anything found in this answer. In the absence of proof that the appellant had agreed to it, the ordinance was not binding on appellant, and the instruction should not have been given, and instruction number 8 asked by appellant and refused, should have been given. Sanders v. Railroad, 147 Mo. 411; Byington v. Railroad, 147 Mo. 673. Of plaintiff's second instruction it is sufficient to say it is inapplicable to the facts in this case. There is no evidence that there were vehicles in the street at the time and place of the accident; the injury was not to a vehicle or to a person in a vehicle nor to a person whose view was obstructed by a vehicle; nor is there any evidence that the car was run at a negligent rate of speed. The testimony was that it was running at a speed of from seven to eight miles per hour. No witness testified that this was an unusual or a dangerous rate of speed, nor to

facts from which it could be reasonably inferred that the speed was negligent. It was also error to tell the jury that the car should have been run so that it could be "readily and quickly stopped, if occasion requires it," without explanation or qualification. A car running on a crowded street where danger is constantly present, should be run at no greater speed than would enable the motorman to stop it readily and quickly, but where the way is clear and there is no traffic on the street, and no appearance of danger ahead, the law does not require a motorman to run his car at so slow a speed as to be able to "readily and quickly" stop it. The use of the terms readily and quickly in an instruction defining the duty of a motorman as to stopping his car, should not be used without explanation, for the duty varies with the presence or remoteness of danger and with the speed at which the motorman may on the particular occasion run his car without being chargeable with negligence. Respondent contends that this instruction was approved by the supreme court in Humbird v. Railroad, 110 Mo. 76. In that case the evidence shows that a number of children, boys and girls, from nine to fifteen years of age, were playing in the street, running from and to opposite sides of the street, and that the car was driven at a rapid rate of speed. Here the danger was apparent, and it was plainly the duty of the driver to keep his team (a pair of horses hitched to the car), under such control as would enable him to speedily and readily stop them, instead of driving them in a gallop, as the evidence tended to show. No such state of facts exist in this case. No children were playing in the street; they were on the sidewalk, the track was clear and the street was clear, and there was no apparent danger of a collision, until the plaintiff ran across the street. The third instruction assumes that the plaintiff was of tender years and imperfect discretion, and on that assumption measures the degree of care the law required of him. No such assumption was warranted by the evidence; he was fifteen years of age; physically strong and of good mind; had

lived for seven years within a block of where he was hurt, and knew that electric cars ran over Franklin avenue, and says he knew they usually run "pretty fast." The courts in many jurisdictions have, as a matter of law, fixed the time when infants *prima facie* arrive at the age of discretion, or are said to have capacity to make them responsible for their conduct and acts. In Rhodes v. Railroad, 84 Ga. 320, it was ruled that an infant under the age of ten years does not *prima facie* have sufficient capacity and knowledge to make him responsible for his conduct and acts, and capacity must be shown. On the other hand, an infant who had arrived at the age of fourteen years, *prima facie* had such capacity and want of it must be shown. While a rule of this kind seems to us to be a convenient, just and reasonable rule of practice, yet we have not been able to find any case in which our supreme court has adopted such a rule, and we will not attempt to do so. However, our supreme court has repeatedly ruled, that where the infant is not so young as to require the judge to say that he could not contribute to his injury, the question of his contributory negligence is one for the jury to pass on by taking into consideration his age, his capacity, his experience and his knowledge of the particular danger. Payne v. Railroad, 129 Mo. 405; Ridenhour v. K. C. Cable R'y Co., 102 Mo. 270. The fourth instruction is not supported by a ray of evidence adduced on the trial. Allan Day, as is assumed in the instruction, was not playing "at or near or on the track," but on the sidewalk, and the motorman was not bound to see or notice him, until he ran into the street towards the track and thus placed himself in a position of peril. The fifth instruction announces a correct proposition of law, and is applicable to the facts in this case. See Klockenbrink v. Railroad, 81 Mo. App. 351, decided at this term, where the cases are reviewed and the question ably discussed by Judge Bond. It was competent for the motorman to state what the appearances of danger were to him when he saw plaintiff running across the street in

front of the car, and to state what his impressions of the situation as to danger to plaintiff were. The reasonableness or unreasonableness of his impressions were for the jury. If found reasonable and that he acted promptly and as the exigencies of the situation required in the situation as he saw it, then he was not guilty of negligence.

The court over the objections of the defendant, permitted plaintiff's counsel to cross-examine the conductor as to a rule of the railroad company, requiring conductors to take names of passengers on his car when an accident occurred, and then to inquire of him if he complied with the rule on the occasion of the injury to plaintiff. There was no issue in the case to which this evidence was at all relevant, and the purpose of its admission is not perceptible. We can not say that it prejudiced the jury, but it was wholly useless and should not have been admitted. Taking the testimony as a whole and allowing the jury (which is their right and privilege) to believe parts of it and to disbelieve other parts, there was evidence in our judgment sufficient to authorize the submission of the case to the jury.

For the errors above noted, the judgment is reversed and the cause remanded. All concur; Judge *Biggs* concurs in the reversal of the judgment.